# In the United States Court of Federal Claims

No. 08-664C
Filed: May 14, 2010

| | |
|---|---|
| TODD O'BRYAN,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) Contract: Grazing permits approved and<br>) administered by the Department of the<br>) Interior's Bureau of Indian Affairs do<br>) not constitute contracts with the United<br>) States where the individual Indian<br>) landowners are charged with the<br>) responsibility for issuing the permits.<br>) Res Judicata: The doctrine of res judi-<br>) cata extends to the decisions of admin-<br>) istrative agencies where the agency is<br>) acting in an adjudicative capacity and<br>) the parties have been given a full and<br>) fair opportunity to litigate their claims.<br>) Illegal Exaction: Where the government<br>) collects money pursuant to an erroneous<br>) construction of a regulation, a claim for<br>) the return of that sum is cognizable as a<br>) claim within the express jurisdiction of<br>) this court. Transfer of Claims: A claim<br>) cannot be transferred to another court<br>) pursuant to 28 U.S.C. § 1631 if the<br>) claim could not be filed in that court in<br>) the first instance. |

Terry L. Pechota, Pechota Law Office, Rapid City, SD, counsel for plaintiff.

Jeffrey D. Klingman, with whom were Assistant Attorney General Tony West, Director Jeanne E. Davidson, and Assistant Director Deborah A. Bynum, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, counsel for defendant. Carrie Prokop, U.S. Department of the Interior, Fort Snelling, MN, of counsel.

## OPINION

WIESE, Judge.

Plaintiff, a member of the Oglala Sioux Indian Tribe, sues here to recover damages for injuries allegedly caused by the United States Department of the

Interior's Bureau of Indian Affairs ("BIA") in its administration of grazing permits granted to plaintiff on the Pine Ridge Indian Reservation in Shannon County, South Dakota. Plaintiff alleges that the BIA (1) unlawfully cancelled plaintiff's grazing permits on lands that the United States holds in trust and manages for the benefit of the Oglala Sioux Tribe; (2) impermissibly collected a rental payment for a period during which plaintiff was denied access to the permitted grazing lands; and (3) improperly assessed penalties for the overstocking of cattle on those lands.

Defendant has moved to dismiss the complaint for lack of jurisdiction and for failure to state a claim upon which relief can be granted. The parties have fully briefed the issues and the court heard oral argument on August 19, 2009.[1] For the reasons set forth below, defendant's motion to dismiss is granted in part and denied in part.

## FACTS

### A.

Pursuant to 25 U.S.C. § 3711(a) (2006), the Secretary of the Interior is directed to provide for the management of Indian agricultural lands to achieve a number of specified objectives, including assisting Indian landowners "in leasing their agricultural lands for a reasonable annual return, consistent with prudent management and conservation practices, and community goals as expressed in the tribal management plans and appropriate tribal ordinances." 25 U.S.C. § 3711(a)(6). Consistent with this authority, the Department of the Interior has promulgated general grazing regulations, set forth at 25 C.F.R. §§ 166.1–166.1001, which identify "the authorities, policies, and procedures the BIA uses to approve, grant, and administer a permit for grazing on tribal land, individually-owned Indian land, or government land." 25 C.F.R. § 166.1(a) (2009). Under the grazing regulations, Indian landowners are primarily responsible for granting permits on their individually owned land, although the regulations require that the BIA "approve all permits of tribal land in order for the permit to be valid." 25 C.F.R. § 166.217(b). The BIA in turn administers these permits including, in many cases, the collection of rent, 25 C.F.R. §§ 166.413, 166.422, and the handling of permit violations, 25 C.F.R. §§ 166.700–166.709.

---

[1] Following oral argument, the court requested supplementary material which plaintiff filed on November 13 and December 1, 2009. At the parties' request, the court then informally suspended proceedings to allow the parties to pursue settlement. On March 10, 2010, the parties notified the court of their failure to reach settlement and the court accordingly lifted the informal stay of proceedings on that date.

When a permittee violates the terms of a permit, the regulations allow the BIA to cancel the permit in its entirety, acting in consultation with the Indian landowners as appropriate. Id. A decision to cancel a permit generally becomes effective 30 days after the permittee receives written notice of the cancellation, 25 C.F.R. §166.707, and is subject to appeal before the Interior Board of Indian Appeals ("IBIA"), 25 C.F.R. §§ 2.3, 2.4(e), 166.3. The IBIA's decision becomes final upon the date of issuance and is treated as "final agency action" for purposes of judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 704. 43 C.F.R. §§ 4.21(c), 4.314(a) (2009). During the pendency of any appeal, however, the permittee must continue to pay rent and comply with the other terms of the permit. 25 C.F.R. § 166.707.

B.

On January 8, 2001, the BIA granted plaintiff grazing permits for range units 6, 9, and 719 within the Pine Ridge Reservation, authorizing plaintiff "to hold and graze livestock on the Trust Indian and Government-owned lands" for the period November 1, 2000, through October 31, 2005. Pursuant to these permits, plaintiff was entitled to graze 165 head of cattle on range unit 6, 168 head of cattle on range unit 9, and 160 head of cattle on range unit 719, in exchange for annual rental payments to be paid on November 1 of each year. The permits additionally specified that "only livestock bearing the brands and marks shown" on the permits could be grazed on the permitted land.

By their terms, the permits could not "be assigned or sublet without the written consent of the parties thereto and the surety, pursuant to the regulations." In addition, the permits were revocable "in whole or in part pursuant to 25 C.F.R. 166.15,"[2] and specified that "any part of the area covered by this permit may be excluded from this range unit by the Superintendent in the exercise of his discretion."

The permits required plaintiff to abide by all applicable provisions of the tribe's grazing ordinance, Oglala Sioux Tribal Ordinance No. 95-05. Additionally, the permits specified that as long as the lands covered by the permits continued to be

---

[2] 25 C.F.R. § 166.15 was the predecessor provision to several sections of the current grazing regulations, including 25 C.F.R. §§ 166.227, 166.228, 166.229(a), and 166.705, all of which became effective on March 23, 2001, with the BIA's revision of the grazing regulations. As explained in the summary of the final rule, the revisions were "meant to further fulfill the Secretary's fiduciary responsibility to federally-recognized tribes and individual Indians," and to "further standardize the process and forms utilized in granting permits on Indian lands." 66 Fed. Reg. 7068 (Jan. 22, 2001).

3

in trust or restricted status, "all of the permittee's obligations under the permit . . . are to the United States as well as to the owner of the land." Finally, certain range control stipulations were attached to and incorporated into the permits, which included the following provision:

> [I]f the number of livestock authorized is exceeded, the permittee shall be liable to pay as liquidated damages, in addition to the regular fees for the full grazing season as provided in the permit, a sum equal to 50 percent thereof for such excess livestock and such livestock shall be promptly removed from the unit.

C.

According to his complaint, plaintiff began to encounter difficulties with the permitted grazing lands almost immediately upon receiving his permits. Plaintiff reports that as early as July 2001, for example, he experienced water problems on range units 6 and 9, specifically an insufficient water supply and the loss of cattle as a result of "bad" water. In addition, plaintiff alleges that James Glade, Chief of Land Operations for the BIA's Pine Ridge Agency, mounted what was in effect an illegal campaign to remove plaintiff's cattle from range unit 719 in favor of allocating the land to Mr. Glade's brother. Plaintiff cites these circumstances as the context for the events that followed.

On April 16, 2002, plaintiff met with the Oglala Sioux Tribe's Allocation Committee—the body responsible for allocating grazing privileges on behalf of the tribe—to discuss the water problems on range units 6 and 9 and plaintiff's proposed solution of converting his permits to seasonal use (i.e., grazing a higher number of cattle for a shorter period of time to take advantage of the higher water quality from April through July). Plaintiff reports that the Allocation Committee offered no objection to his proposal. Additionally, plaintiff contends that he made numerous oral requests to the BIA from October 2002 until July 2003 to convert his permits for range units 6 and 9 to seasonal use to ameliorate the water problems on those parcels. There is no indication in the record, however, that such requests were ever granted.

On April 23, 2003, approximately one year after his meeting with the Allocation Committee, plaintiff approached Mr. Glade to repeat his request that his permits be converted to seasonal use. Although Mr. Glade advised plaintiff that he did not have time then to discuss the matter, plaintiff informed Mr. Glade that he nevertheless intended to graze yearlings on range units 6 and 9 and to remove them by the middle of July. The following day, in an apparently unrelated action, the Allocation Committee voted to allocate range unit 719 to two other tribe members, including Cliff Glade, Mr. Glade's brother.

4

Despite plaintiff's efforts to convert his permits to seasonal use, plaintiff received a May 28, 2003, letter from the BIA informing him that he had violated the terms of his permits by overstocking range units 6 and 9 by 770 head of yearlings and by grazing brands of cattle not identified in his permits. The letter indicated that because of recent drought conditions, such overstocking threatened "immediate, significant and irreparable harm to the Indian rangeland." The BIA thus ordered plaintiff to remove the excess livestock within three days and further advised that any failure to abide by the specified use in the permits could result in the cancellation of the permits if not cured within ten days of the receipt of the letter.

On June 16, 2003, plaintiff met with the Oglala Sioux Tribe's Land Committee. At the meeting, Mr. Glade acknowledged that plaintiff had informed him of plaintiff's intention to graze yearlings from April until mid-July. Plaintiff contends that at no time was he informed that there would be a problem with such seasonal use. In addition, the Land Committee approved a motion on June 17, 2003, requesting that the BIA stop all action against plaintiff until the issue could be resolved "in a positive way."

Plaintiff responded in writing to the BIA's May 28 letter on June 22, 2003. Although plaintiff acknowledged the presence of additional cattle on range units 6 and 9, he maintained that he was not in fact overgrazing the land because his use of the range units was seasonal rather than continuous and the yearlings would accordingly be removed in July and August. Plaintiff once again requested, however, that the BIA convert his annual grazing permits to seasonal use. Plaintiff additionally noted that the brands of cattle on range units 6 and 9, although not identified in the corresponding permits, had nevertheless been approved for use on range unit 719, leading plaintiff to conclude that the brands were also authorized to graze on range units 6 and 9.

In a July 10, 2003, response to plaintiff's letter, the BIA informed plaintiff that it was cancelling his permits for range units 6 and 9 and assessing $55,504.50 in liquidated damages against him. As the predicate for its decision, the BIA identified plaintiff's overstocking of range units 6 and 9, plaintiff's failure to cure the overstocking violations, and plaintiff's grazing of brands of cattle not identified in the permits. The BIA additionally advised plaintiff that he could appeal the decision to the Regional Director of the BIA's Great Plains Office pursuant to 25 C.F.R. pt. 2.

In response, plaintiff removed 1,200 yearlings from range units 6 and 9 but appealed the BIA's decision to the Regional Director. While his appeal was pending, plaintiff made two attempts—in September and October 2003—to pay the rent due on range units 6 and 9 for the 2004 grazing season but was told by the BIA that he was not authorized to use those range units because the BIA had cancelled his

permits.[3] Plaintiff claims that he was consequently forced to sell the 800 yearlings slated for range units 6 and 9 for a total loss of $300,000.

By letter dated December 8, 2003, the Regional Director informed plaintiff that she was sustaining the BIA's decision to cancel his permits, increasing the liquidated damages assessed against him to $94,928.04, and directing the BIA to impose an additional $35,017.50 in penalties for plaintiff's "grazing livestock without a pasture authorization." Plaintiff appealed the Regional Director's decision to the IBIA pursuant to 43 C.F.R. § 4.330. In his appeal, plaintiff argued that the livestock counts were both unreliable and influenced by employee bias, that the overstocking limitations were not part of his grazing permits, that the BIA should have converted his permits to seasonal use, and that the damages and penalties imposed were improper and incorrectly calculated.

In April 2004, while his appeal to the IBIA was pending, plaintiff renewed his request to the BIA to use range units 6 and 9, this time for the 2005 grazing season. Although the BIA had denied plaintiff's identical application the previous year, the BIA approved plaintiff's use of the range units for 2005. Rather than apply plaintiff's $38,003 rental payment to the 2005 grazing season as plaintiff intended, however, the BIA instead applied the payment to the 2004 grazing season and conditioned plaintiff's use of the land in 2005 on a second payment of the same amount. Plaintiff thus maintains that he was erroneously required to pay the annual rental fees twice—once for 2004 when he was not allowed to graze on units 6 and 9 and a second time for 2005 when his access to the permitted land was restored.

In a decision issued on July 11, 2005, the IBIA sustained the Regional Director's decision to cancel plaintiff's permits for range units 6 and 9. The IBIA rejected plaintiff's argument that employee bias had influenced the findings regarding his permit violations or had affected the decisions of either the Superintendent of the Pine Ridge Agency or the Regional Director to cancel his permits. The IBIA additionally found that the overstocking violation was alone sufficient to warrant the cancellation of plaintiff's permits. Despite this finding of liability, however, the IBIA vacated the assessment of $94,928.04 in liquidated damages, reversed the imposition of $35,017.50 in additional penalties, and remanded the matter to the Regional Director for a determination of the actual damages, if any, caused by

---

[3] The facts as stated are drawn from plaintiff's complaint and from a supplementary filing submitted at the court's request explaining in greater detail the circumstances related to the 2004 grazing-fee issue. As part of the parties' settlement discussions, defendant was given the opportunity to verify plaintiff's account of the facts regarding the 2004 grazing fees. Defendant has not presented any evidence to suggest that the facts as stated are not accurate.

plaintiff's overstocking. <u>O'Bryan v. Acting Great Plains Regional Director</u>, 41 IBIA 119, 132 (2005).

Following the IBIA's decision, plaintiff requested an extension of time until August 11, 2005, to remove his cattle from range units 6 and 9, but received no response from the BIA. According to the complaint, "[t]he police were sent out" and plaintiff was "given 3 days to remove his cattle from the land requiring him to put 700 head of cattle in a feedlot and incur a $70,000 loss on the cattle."

On February 7, 2006, the Regional Director issued a decision on remand reducing the liquidated damages to $23,732.01. Plaintiff again appealed to the IBIA. In a November 13, 2008, order, the IBIA reiterated its 2005 holding that plaintiff "is liable for his overstocking violations," but vacated the Regional Director's assessment of recalculated liquidated damages and remanded the case once again for a calculation of the actual damages, if any, attributable to plaintiff's overstocking. <u>O'Bryan v. Great Plains Regional Director</u>, 48 IBIA 109, 111 n.4 (2008). To date, the Regional Director has issued no decision on remand.

On September 22, 2008, plaintiff filed suit in this court, identifying eight grounds for relief.[4] In essence, plaintiff objects to the cancellation of his grazing

---

[4] In the first count of his complaint, plaintiff contends that he was deprived of express and implied contract rights to range unit 719 by certain actions of Mr. Glade, resulting in the reallocation of that range unit to Mr. Glade's brother and nephew. In the second and third counts, plaintiff asserts that his express and implied contract rights were similarly violated by the cancellation of his permits for range units 6 and 9 and by his exclusion from those range units during the 2004 grazing season. In the fourth count, plaintiff argues that the BIA's application of plaintiff's rental payment to the 2004 grazing season represented a taking of plaintiff's property under the Fifth Amendment to the United States Constitution. In the fifth count, plaintiff alleges that he was denied full use and enjoyment of range units 6 and 9 for the 2005 grazing season because of certain actions of Mr. Glade that were in contravention of various ethical guidelines and in violation of the Constitution's Due Process and Equal Protection Clauses. In the sixth count, plaintiff claims that his individually owned land located within range unit 9 has been overgrazed and permanently damaged in violation of the United States' trust responsibilities to maintain the land. In the seventh count, plaintiff argues that the penalties and interest that were assessed against him by the Regional Director are arbitrary and capricious. In the eighth and final count, plaintiff seeks attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(b). In later briefing, however, plaintiff acknowledged that the due process and equal protection claims set forth in count five do not involve rights that are enforceable by a money judgment and therefore are not

(continued...)

7

permits for range units 6, 9, and 719, the BIA's collection of a rental payment for the 2004 grazing season, and the BIA's imposition of penalties for plaintiff's permit violations, based on various theories of contract, taking, breach of trust obligations by the government, and illegal actions by a government employee. Plaintiff seeks $550,000 in damages for his alleged injuries.

## DISCUSSION

Central to plaintiff's claim for damages is the contention that his grazing permits constitute contracts with the United States whose breach may be redressed in this court. Part of this assertion is undisputed: defendant acknowledges that the permits exhibit sufficient indicia of a property interest—they may, for example, be assigned or mortgaged—to support their classification as promissory undertakings establishing a right to the use of the land, i.e., as contracts. What defendant does not accept, however, is that the permits are contracts with the United States. Rather, defendant maintains that the permits are contracts between plaintiff and the individual Indian landowners. We agree with defendant.

Both the grazing regulations and the grazing permits are issued under the authority of several statutes including, most recently, the American Indian Agricultural Resource Management Act ("AIARMA"), 25 U.S.C. §§ 3701–3746. Among the stated purposes of AIARMA are the furtherance of the historically recognized trust responsibilities of the United States for Indian-owned lands and the promotion of Indian self-determination through the strengthening of tribal authority over the management of those lands. 25 U.S.C. §§ 3702, 3712, 3715. To implement these goals, the grazing regulations contemplate that the permitting of Indian agricultural land (a term that refers both to farmland and to rangeland, 25 C.F.R. § 166.4) will be carried out by the BIA pursuant to "an appropriate tribal resolution establishing a general policy for permitting of Indian agricultural lands," 25 C.F.R. § 166.100, and will be subject to "tribal laws regulating activities on Indian agricultural land, including tribal laws relating to land use," 25 C.F.R. § 166.103.

Consistent with these policies, the grazing regulations provide for significant control and involvement by the tribe and the individual landowners in the management of Indian lands. In particular, the grazing regulations (1) require that the BIA

---

[4](...continued)
redressable in this court. See, e.g., Mullenberg v. United States, 857 F.2d 770, 773 (Fed. Cir. 1988) (holding that "it is firmly settled that [the Due Process and Equal Protection Clauses] do not obligate the United States to pay money damages"). By motion dated December 1, 2009, plaintiff additionally withdrew count six (involving the alleged overgrazing of his individually owned land) as insufficiently developed.

consult with Indian landowners in the establishment of range units, 25 C.F.R. § 166.302; (2) provide that "the class of livestock and livestock ownership requirements for livestock that may be grazed on range units" will be made by tribal determination, 25 C.F.R. § 166.309; and (3) establish that Indian landowners may negotiate permits and advertise for bids, 25 C.F.R. § 166.220. In addition, the grazing regulations direct that grazing rental payments are to be made "directly to the Indian landowners or to [the BIA] on behalf of the Indian landowners," 25 C.F.R. § 166.413, and instruct that the Indian landowners are the ones "primarily responsible for granting permits on their Indian land, with the assistance and approval of the BIA," 25 C.F.R. § 166.216.

Given this framework and its affirmation of the authority vested in the tribes and in the individual Indian landowners in the management of Indian agricultural lands, we conclude that defendant is correct in its assertion that the permits are contracts with the Indian landowners and not with the United States. Because the authority for the issuance of the permits rests in the first instance with the Indian landowners, the permits are properly regarded as contracts with the landowners.

Plaintiff objects to this conclusion, arguing that the United States was in fact a contracting party in the formation of the permits. In support of this point, plaintiff observes that the permits were signed by the Superintendent of the Pine Ridge Indian Reservation (a BIA official) rather than by the individual Indian landowners and that by the terms of the permits "all of the permittee's obligations under the permit and the obligation of his sureties are to the United States as well as to the owner of the land." Contrary to plaintiff's assertion, however, these facts do not demonstrate that the United States is a contracting party. As previously noted, both AIARMA and the grazing regulations are grounded on the trust responsibilities of the United States for the management of Indian land and resources. The United States therefore cannot be understood as acting for its own account in approving and administering the grazing permits, but must instead be seen as acting in its role as trustee for the Indians. And in that capacity, the United States neither intends nor creates a contract right in a permittee's favor. See United States v. Algoma Lumber Co., 305 U.S. 415, 422 (1939). Further, the language of the permits is consistent with the proper discharge of the United States' role as protector of the Indians; no promissory commitment to plaintiff may be associated with the discharge of that role.

Plaintiff additionally argues that the interests of the United States under the permits are sufficiently aligned with the interests of the Indian landowners as to warrant treating the two as contractually the same. By this reasoning, plaintiff would transmute a contract with the landowners into one with the United States. Plaintiff offers no legal support for this argument, however, and we are compelled to reject

it: the United States cannot be substituted as a party to a contract to which it never agreed.[5]

Yet, even if we were to accept the proposition that the grazing permits constitute contracts with the United States, such a determination would not lead to a ruling in plaintiff's favor. Indeed, plaintiff would still face an insurmountable hurdle: the preclusive effect of the IBIA's decision upholding the cancellation of plaintiff's permits. In its decision, the IBIA determined, on the basis of undisputed facts, that plaintiff "was in violation of his permit when he grazed cattle bearing a brand not authorized under the permit" and when he failed "to obtain a permit modification before adding livestock to [range units] 6 and 9." O'Bryan, 41 IBIA at 126. Based on these findings, the IBIA upheld the Regional Director's cancellation of plaintiff's permits.

Despite the IBIA's conclusion on this point, plaintiff essentially seeks to relitigate the issue, this time under a breach of contract theory. Under the doctrine of res judicata, however, a party may not relitigate an issue that was raised or could have been raised in a previous action that resulted in a final judgment on the merits. Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981); Restatement (Second) of Judgments § 19 (1982). This doctrine extends to decisions of administrative agencies acting in an adjudicative capacity: "When an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422 (1966). Plaintiff was given a full and fair opportunity to contest the cancellation of his grazing permits before the IBIA and is thus precluded from seeking to relitigate the same set of operative facts here.[6]

---

[5] Plaintiff additionally alleges that Mr. Glade agreed to plaintiff's seasonal use of the permitted grazing lands, thereby creating an implied contract authorizing the very use for which the permits were later revoked. Because we conclude that the permits are not contracts with the United States, however, we consequently find that an alleged modification of those permits through an implied contract would not affect contract interests of the United States.

[6] The fact that the IBIA could not have provided monetary relief (in contrast to a contract action in this court) does not detract from the finality of its decision. What matters for the purposes of res judicata is that plaintiff was afforded a full and fair opportunity to be heard in the prior proceeding, including the right to challenge any opposing evidence. Restatement (Second) of Judgments § 83(2)(b) (1982). Nor do we believe that the fairness of the proceedings before the IBIA was affected by the

(continued...)

10

In addition to his contract-based theories, plaintiff makes various claims based on the alleged misconduct of Mr. Glade. In particular, plaintiff contends that Mr. Glade was instrumental in securing the cancellation of plaintiff's permit for range unit 719 through "a concerted and open campaign to smear [plaintiff's] good name." Plaintiff further contends that Mr. Glade was actively involved in bringing about the cancellation of his permits for range units 6 and 9 by thwarting plaintiff's efforts to obtain the formal modifications necessary to convert the permits to authorized seasonal use. Plaintiff describes Mr. Glade's actions as involving a "blatant conflict of interest" and contends that they were "contrary to the rules and regulations of the Department of Interior, including applicable [Office of Personnel Management] ethical guidelines." Finally, plaintiff maintains that Mr. Glade violated the fiduciary obligations that the United States as trustee of the Indian grazing lands owes to the owners of those lands.

The injuries plaintiff attributes to Mr. Glade would be actionable, if at all, as torts—a category of claim over which this court has no jurisdiction. 28 U.S.C. § 1491(a)(1) (limiting the claims that may be heard in this court to cases "not sounding in tort"); Brown v. United States, 105 F.3d 621, 623 (Fed. Cir. 1997) (observing that the Court of Federal Claims "is a court of limited jurisdiction" that "lacks jurisdiction over tort actions against the United States"). Moreover, even if plaintiff is correct that Mr. Glade's conduct violated his duties as a trust officer charged with the proper administration of trust lands, those duties are owed to the Indian landowners and not to plaintiff as a permittee. For these reasons, plaintiff's charges of administrative malfeasance must be dismissed.

Plaintiff's claim for the return of his 2004 rental payment, by contrast, is redressable in this court and must, on the facts presented here, be determined in his favor. As discussed above, plaintiff approached the BIA twice in the fall of 2003 about continuing his use of range units 6 and 9 in 2004 pending the outcome of the appeal of his permit cancellations but was informed on each occasion that he would not be permitted to do so. Notwithstanding the BIA's position, plaintiff received notice from the Superintendent of the Pine Ridge Agency on May 21, 2004, advising him that the cancellation decision was stayed pending the outcome of the appeal and

---

[6](...continued)
fact that plaintiff's appeal was decided on the basis of affidavits rather than live testimony. Plaintiff does not explain how this approach hindered the effective presentation of his case and given that the IBIA based its decision on undisputed facts, we can attribute no significance to this choice of procedure. See, e.g., EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc., 746 F.2d 375, 378 (7th Cir. 1984) (according preclusive effect to a decision based partially on deposition testimony where the plaintiff failed to show "how its case was affected in any way by [such] testimony . . . much less how it was disadvantaged by that method").

11

that plaintiff remained liable for the rental fees for those range units. Plaintiff protested the imposition of these fees, arguing that he would be unable to make beneficial use of the land so late in the grazing season, but the BIA nevertheless insisted that plaintiff pay both the 2004 and 2005 grazing fees before resuming his use of the permitted lands. Plaintiff now seeks the return of his 2004 grazing fees on range units 6 and 9 under the theory that the BIA acted unlawfully in demanding payment for range lands whose use the BIA had initially denied him. We agree with plaintiff.

The grazing regulations provide that a decision to cancel a permit "will remain ineffective [i.e., be suspended] if the permittee files an appeal under . . . this subpart" and direct that "[w]hile a cancellation decision is ineffective, the permittee must continue to pay rent and comply with the other terms of the permit." 25 C.F.R. § 166.707. Plaintiff thus had the right, under the plain terms of the regulations, to continue his use of range units 6 and 9 while his appeal was pending. As we have noted, however, the BIA denied plaintiff access to the lands during the 2004 grazing season but thereafter required plaintiff to pay the full year's grazing fees for 2004. In so doing, the BIA violated its regulations. The regulations do not authorize the BIA to deny the use of permitted lands while an appeal of a cancellation decision is pending, much less allow the agency to impose grazing fees that do not correspond to the actual use permitted. In short, the BIA's demand for payment of the 2004 grazing fees amounted to an unlawful exaction, i.e., a demand for the payment of money not authorized by law.

Such a claim is, of course, well within our jurisdiction. This court has long recognized that where the government collects money pursuant to an erroneous construction of a statute, a claim for the return of that sum is cognizable as a claim founded on an act of Congress and, as such, is a claim within the express jurisdiction of this court. Clapp v. United States, 127 Ct. Cl. 505, 511–12 (1954). The same result follows in the instant case. This court's basic jurisdictional statute, 28 U.S.C. § 1491, grants the court authority "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department." A claim alleging an illegal exaction pursuant to an erroneous application of a regulation is as much within our jurisdiction as a claim of illegal exaction founded on an act of Congress. See Aerolineas Argentinas v. United States, 77 F.3d 1564, 1572–73 (Fed. Cir. 1996). Because the BIA acted in violation of law in requiring plaintiff's payment of the 2004 grazing fees for range units 6 and 9, plaintiff is entitled to a refund of that amount.[7]

---

[7] Payment of any judgment is subject to the government's right of setoff under 31 U.S.C. § 3728 and must therefore await the outcome of the IBIA's remand of November 13, 2008, directing the Regional Director to use actual damages rather
(continued...)

12

Having addressed each of plaintiff's various claims, we turn to a final matter: plaintiff's request that we transfer any claims found to fall outside this court's jurisdiction to the United States District Court for the District of South Dakota, Western Division. Pursuant to 28 U.S.C. § 1631, a court, upon finding that a civil action (including a petition for review of an administrative action) is beyond its jurisdiction, "shall, if it is in the interest of justice, transfer such action . . . to any other such court in which the action . . . could have been brought at the time it was filed." The difficulty with plaintiff's request is that the relief he presumably seeks from the district court—a review of the IBIA's decision under the standards of the APA, 5 U.S.C. § 706[8]—is unavailable to him at present because the IBIA's decision is not yet final (damages for overgrazing remain to be determined). Because only "final agency action" is made subject to judicial review under the APA, 5 U.S.C. § 704, a petition for review before the district court would be premature and the district court would therefore lack subject matter jurisdiction to hear plaintiff's claim. Veldhoen v. United States Coast Guard, 35 F.3d 222, 225 (5th Cir. 1994). Since plaintiff's request for judicial review could not be filed in the district court in the first instance, neither then may we transfer this action there.

CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is granted in part and denied in part. The clerk is directed to enter judgment as follows:

(i) dismissing the first, second, and third counts of the complaint (alleging various contract-based theories of recovery) for failure to state a claim upon which relief can be granted;

(ii) refunding plaintiff's payment in the amount of $38,003 for the 2004 grazing season, pursuant to the fourth count of the complaint, subject to the conditions identified in footnote 7;

(iii) dismissing the fifth count of the complaint (alleging essentially tortious actions of a BIA employee) for lack of jurisdiction;

---

[7](...continued)
than liquidated damages as the basis for determining whether plaintiff will be subject to overgrazing penalties. Not until the amount of such penalties has been determined will the BIA's ultimate liability to plaintiff, if any, be known.

[8] The tort claims plaintiff asserts here were also presented in the IBIA proceedings.

      (iv) dismissing the sixth count of the complaint (alleging overgrazing of plaintiff's individually owned grazing lands) without prejudice pursuant to plaintiff's December 1, 2009, motion for voluntary dismissal; and

      (v) dismissing the seventh and eighth counts of the complaint (challenging the imposition of grazing penalties and seeking the recovery of attorney's fees and costs pursuant to 28 U.S.C. § 2412, respectively) as premature.[9]

---

[9] The timing of and procedures applicable to claims for the recovery of attorney's fees and costs are set forth in RCFC 54(d).

14